UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE GIBSON, | Case No. 17-cv-01705-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |
| VANJANI, et al., | Docket Nos. 23, 35, 37 |
| Defendants. | |

## I.     INTRODUCTION

In this *pro se* prisoner's civil rights action, Arthur Lee Gibson complains about medical care he received at San Quentin State Prison.  Defendants have filed a motion for summary judgment, which Mr. Gibson has opposed.  For the reasons discussed below, Defendants' motion for summary judgment will be granted and judgment entered against Mr. Gibson.

## II.     BACKGROUND

Defendants denied Mr. Gibson's requests in mid-2016 to be provided Harvoni, a medication he sought to treat his hepatitis C.  The issue in this action is whether Defendants acted with deliberate indifference to a serious medical need when they denied the requests in mid-2016.  (Only claims for damages remain because Mr. Gibson was treated successfully with Harvoni earlier this year.)

The following facts are undisputed unless otherwise noted.

The events giving rise to Mr. Gibson's Eighth Amendment claim took place in April, May and August 2016 (the "relevant time").  At the relevant time, Mr. Gibson was a prisoner at San Quentin State Prison.  The three defendants were doctors working at San Quentin: (1) Dr. Vanjani was a primary care provider who declined to provide Harvoni to Mr. Gibson in April 2016; (2) Dr.

Rowe was the chief physician and surgeon at San Quentin who signed the first-level response denying Mr. Gibson's inmate appeal about the treatment; and (3) Dr. Tootell was the chief medical executive at San Quentin who signed the second-level response denying Mr. Gibson's inmate appeal.

A.      Hepatitis C and Its Treatment

Hepatitis C is an infectious disease caused by the hepatitis C virus (HCV) that primarily affects the liver. Docket No. 23-1 (Bick Decl.) at 3. After HCV infection, approximately 20% of infected persons will clear the HCV from their bodies without treatment, and approximately 80% will not do so. Of that approximately 80% of the infected people who do not clear HCV from their bodies, most "will have no significant sequelae, meaning no medical conditions, from their HCV infection." Docket No. 23-1 at 4. About 20% of those who are chronically infected with HCV "will progress to cirrhosis over a 20- to 30-year time frame. There is, however, no single test that can predict who will progress to severe liver disease." *Id.*

> Until relatively recently, treatment for most forms of HCV was highly toxic and not very effective. Hence, nationally recognized HCV-treatment guidelines recommended that patients be treated based on the severity of their liver disease. Patients with more advanced inflammation and fibrosis were prioritized for treatment. Patients with less advanced fibrosis were monitored, with the understanding that many of them would never progress to more severe liver disease or require treatment.

Docket No. 23-1 at 3.

The medication Harvoni was approved by the Food and Drug Administration in October 2014 as a treatment for HCV. Dr. Bick, a defense expert who is licensed to practice medicine in California and is board-certified in internal medicine, explained the impact of this particular new drug.

> [Harvoni] represented a groundbreaking approach to the treatment of HCV. Healthcare organizations grappled with how to incorporate this new treatment. Most practitioners used a cautious and measured approach to this new treatment by providing treatment on patients with more advanced disease. This approach permitted the medical community to become more familiar with the new treatment's use, safety and efficacy profile. This approach was appropriate for HCV because it is a disease that progresses very slowly, if at all. CDCR's approach to HCV treatment has been consistent with nationally

accepted standards of medical treatment for HCV patients.

Docket No. 23-1 at 3; *see also* Docket No. 23-4 (Feinberg Decl.) at 5-6 (gradual roll-out of

Harvoni "was appropriate for HCV because, unlike cancer, it is a disease that progresses very

slowly").

B.    Care of California Prisoners With HCV

During the relevant time, inmates in the custody of the California Department of

Corrections and Rehabilitation (CDCR) received HCV treatment under the standards in the

October 2015 California Correctional Health Care System (CCHCS) Care Guide: Hepatitis C.

Docket No. 23-1 at 3; Docket No. 23-3.  The CCHCS Care Guide was a 14-page document that

had detailed information about many topics, including treatment options, diagnosis, diagnostic

criteria, acute HCV, "patient selection for treatment," "chronic HCV treatment," medications

(including dosing and adverse effects), management of side effects of treatment, and patient

education.  Docket No. 23-3.

Under CCHCS policy, HCV treatment required approval from the CCHCS HCV Oversight

Committee.  An individual physician at a local prison could not prescribe HCV treatment for an

inmate without approval from the CCHCS HCV Oversight Committee.  Docket No. 23-1 at 4.

Under the CCHCS policy in effect during the relevant time, treatment eligibility was based

on estimated disease severity because not every patient with chronic HCV required treatment.

During the relevant time, CCHCS guidelines deferred treatment for those with minimal liver

disease or a low likelihood of significant liver disease.  *Id.*[1]  HCV status and treatment eligibility

for a patient was reassessed at least annually, and doctors could consider various tests every 6-12

months to assess a patient's condition and to evaluate whether the condition had progressed.

Docket No. 23-1 at 4.

The CCHCS used a FIB4 index in HCV treatment decisions.  The FIB4 index was a

calculation of lab values that predicted current cirrhosis levels.  A FIB4 score higher than 3.25 had

_____

[1] The federal Bureau of Prisons also prioritized prisoners for HCV treatment based on the severity
of the disease.  *See Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection:
Federal Bureau of Prisons Clinical Guidance* (October 2016 ed.), pp. 7-8 (available at
https://www.bop.gov/resources/pdfs/hepatitis_c.pdf).

1    a positive predictive value of 82% to confirm the existence of stage 3 or stage 4 fibrosis, and a

2    FIB4 score of lower than 1.45 had a negative predictive value of 94.7% to exclude severe fibrosis.

3    Patients with FIB4 scores of less than 1.45 were unlikely to have significant liver fibrosis or

4    cirrhosis.  Docket No. 23-1 at 4-5.  Inmates with FIB4 scores of less than 1.45 did not meet

5    CCHCS guidelines for treatment.  Docket No. 23-1 at 5.

6            For many years, a liver biopsy was recommended to evaluate inflammation and liver

7    fibrosis.  Less invasive methods were later developed to assess liver fibrosis and a liver biopsy

8    was no longer necessary in most cases.  Docket No. 23-1 at 5.

9            The FibroScan was a non-invasive tool, similar to an ultrasound, used to measures liver

10   stiffness, "which correlate[s] extremely well with fibrosis."  Docket No. 23-1 at 6; Docket No. 23-

11   4 at 5.  The FibroScan was a safer alternative to a liver biopsy to measure liver fibrosis.  Docket

12   No. 23-4 at 5.  There were several possible FibroScan scores:  F0-F1 represented no significant

13   fibrosis; F2 represented mild fibrosis; F3 represented significant fibrosis; and F4 represented

14   cirrhosis.  Docket No. 23-4 at 5.[2]

15           In light of recently available treatments, most individuals infected with HCV can be cured

16   with oral treatments now.  As a result, in December 2017, CCHCS revised its HCV-treatment

17   guidelines "with the goal of eventually offering treatment to all those who are chronically

18   infected."  Docket No. 23-1 at 6.  (It is important to note again that the relevant time for purposes

19   of this action is mid-2016 and that, since then, the treatment of HCV continues to evolve.)

20   C.      Mr. Gibson's HCV

21           1.      Mr. Gibson's Condition Before 2016

22   Mr. Gibson has had HCV since at least 2006.  Docket No. 34 at 1.

23           In September 2006, a liver biopsy was done on Mr. Gibson.  The biopsy demonstrated

24   low-grade fibrosis (grade 0-1) and minimal inflammation.  Docket No. 23-1 at 5; Docket No. 33 at

25   22.  Based on this biopsy, Mr. Gibson did not qualify for HCV treatment under then-existing

26   prison treatment guidelines.  Docket No. 23-1 at 5.

27

28   _____
     [2] The FibroScan, like the liver biopsy and the FIB4 index, were not CDCR-specific tools and
     instead were used in the general medical community for the care of HCV-infected patients.

4

In January 2012, another liver biopsy was done on Mr. Gibson.  The biopsy result showed a grade 2-3 fibrosis and grade 2 inflammation.  Docket No. 33 at 25; *cf.* Docket No. 23-1 at 5 (describing result, but stating date of biopsy as October, rather than January, of 2012).  Based on the degree of fibrosis in this biopsy, Mr. Gibson could be considered for treatment under then-existing prison treatment guidelines.  The available treatments at the time involved weekly injections and daily pills.  The treatments were associated with significant toxicity and side effects, as well as cure rates of only 70-80%.  Docket No. 23-1 at 5.  Mr. Gibson was interviewed by his psychiatrist because psychiatric clearance was required before treatment could begin.  Docket No. 34 at 2.  Mr. Gibson and the psychiatrist talked about a "new breakthrough drug that was being put on the market and that the CDCR was working out the details in order to get the drug to state prisoners." *Id.*  The psychiatrist told Mr. Gibson that he had the option to wait for the new drug, and Mr. Gibson decided to do so.  Docket 34 at 2.

By 2014, Mr. Gibson had started experiencing ailments that he apparently attributed to HCV: colds, sore throats, phlegm, cramps, fatigue, abdominal pains, back pains, headaches, overactive bladder and colon, and severe depression.  Docket No. 34 at 2-3.  There is no evidence that a doctor ever attributed any of these problems to HCV.

At an appointment on March 6, 2014, Dr. Reyes noted that Mr. Gibson was now interested in pursuing HCV treatment and noted that she sent an email to Dr. Pachynski for this purpose. Docket No. 23-6 at 15-16.

At their next appointment on July 15, 2014, Dr. Reyes advised Mr. Gibson that he would be scheduled "once there is availability."  Docket No. 23-4 at 4; Docket No. 23-6 at 17-18.  Dr. Reyes noted that Mr. Gibson's most recent laboratory test results were quite good and stable, and there was no urgency for the referral to Dr. Pachynski. *Id.*

Dr. Pachynski saw Mr. Gibson in October 2014 at the Hepatitis C Treatment Clinic. Docket No. 23-4 at 4; Docket No. 23-6 at 21.  Dr. Pachynski explained to Mr. Gibson that the most severe cases would receive the Harvoni treatment first.  Docket No. 34 at 3.  Mr. Gibson understood but was displeased because he felt that he also deserved treatment. *Id.*

There was evidence that Mr. Gibson's liver condition improved over time.  Mr. Gibson's

United States District Court
Northern District of California

medical records show that, as of October 21, 2014, he had a FIB4 score of 1.24. Because this FIB4 score was less than 1.45, it meant that it was unlikely that Mr. Gibson had any significant fibrosis. Docket No. 23-4 at 7.

Mr. Gibson later learned that he would not be eligible for treatment. Docket No. 34 at 3.

In her notes for Mr. Gibson's June 2, 2015, appointment, Dr. Reyes wrote that she had discussed the case with Dr. Pachynski and that, based on Mr. Gibson's "very solid FIB-4 score and a borderline biopsy result," he would not be eligible for any treatment at this point. Docket No. 23-6 at 26.

2.    Defendants' Consideration of Mr. Gibson's Case

Dr. Vanjani saw Mr. Gibson for the first time on December 22, 2015. According to Dr. Vanjani's notes, Mr. Gibson was "frustrated about not currently being a candidate for HCV treatment" now that a new treatment was available, whereas he had been a candidate when the treatment offered was interferon. Docket No. 23-6 at 29. Dr. Vanjani noted that he "explained that there are strict criteria on treatment throughout the country and that we will continue to monitor his liver function carefully and as soon as he qualifies, we will plug him into care." Docket No. 23-6 at 29; *see* Docket No. 23-1 at 5.

Dr. Vanjani saw Mr. Gibson again on March 3, 2016, and noted again that Mr. Gibson was not currently a treatment candidate. Dr. Vanjani further noted that Mr. Gibson's biopsy result from 2012 "showed grade 2-3 fibrosis, which seems more sever[e] than his FIB-4 score would suggest, will schedule him for a fibroscan." Docket No. 23-6 at 31. According to Dr. Bick, Mr. Gibson's FIB4 score indicated "that it was unlikely Gibson had any significant fibrosis." Docket No. 23-1 at 5-6. In accordance with the CCHCS Care Guide, treatment would be deferred due to the FIB4 score of less than 1.45. Docket No. 23-1 at 5-6. Dr. Rowe approved the request for a FibroScan. Docket No. 23-1 at 6.

On March 28, 2016, a FibroScan was done on Mr. Gibson. Mr. Gibson's liver stiffness score was 4.9. Docket No. 33 at 33. According to the FibroScan report, that liver stiffness score was consistent with F0-F1, which represented "no significant fibrosis." *Id.*; Docket No. 23-1 at 6. According to Dr. Bick, the FibroScan "results suggest an improvement in Gibson's liver function

over time.  Based upon the FibroScan, and other lab work [at] that time, Gibson would not have been a candidate for treatment under the CCHCS Care Guide."  Docket No. 23-1 at 6.

At an appointment on April 7, 2016, Dr. Vanjani reviewed the results of the FibroScan and explained to Mr. Gibson that he was not currently a candidate for treatment due to his FIB4 score and FibroScan result that suggested a milder disease, notwithstanding the 2012 biopsy that showed stage 2-3 fibrosis.  Docket No. 23-6 at 35.  Mr. Gibson was displeased that he earlier had been considered a candidate for treatment for his HCV but now, having waited for a better medication, was no longer deemed a candidate.  *Id.*; Docket No. 1 at 6; Docket No. 23-6 at 35.

Mr. Gibson then filed an inmate appeal, complaining that he had been denied requested HCV treatment.  Docket No. 1 at 9; Docket No. 34 at 4.  Defendant Dr. Rowe signed the first-level response to the inmate appeal that denied relief.  Docket No. 1 at 13-14.  The first-level response explained that "[t]he current CCHCS policy (which Dr. Vanjani is following) does not permit treatment based on that low stage of fibrosis (F0-F1)" which Mr. Gibson's current FibroScan study showed.  *Id.* at 13.  Defendant Dr. Tootell signed the second-level response that denied the inmate appeal.  *Id.* at 17-18.  The second-level response agreed with the first-level response, and further noted that Mr. Gibson had met with Dr. Vanjani on July 7, 2016, "and it was explained to [Mr. Gibson] that laboratory tests will be repeated by the end of the year, however, at this time, treatment is not deemed medically necessary."  *Id.* at 18.  The inmate appeal also was denied at the third level.  *Id.* at 19-20.

Based on his review of the documents, his medical education, and his experience as a physician, Dr. Bick expressed his medical opinion "that hepatitis C treatment was not medically necessary at the time alleged in Gibson's complaint."  Docket No. 23-1 at 6.  He further stated:

> Based on the materials I reviewed, there is no objective medical evidence that Gibson has suffered any detriment because of his hepatitis C condition.  Gibson has no demonstrable progression of any liver disease.  Further, there is no objective medical evidence that Gibson suffered from any symptoms attributable to his hepatitis C condition.  Gibson has been monitored regularly for his HCV. Gibson's treatment was consistent with national recognized treatment guidelines.  It is my further opinion that the treatment Gibson received for his hepatitis C fell within the standard of care that a similarly situated person could have expected to receive from the medical community. . . .  Drs. Tootell, Rowe and Vanjani's

decisions were medically appropriate and in accordance with the CCHCS Care Guide: Hepatitis C, in effect at the time, because hepatitis C treatment was not medically necessary.

Docket No. 23-1 at 6-7.

### 3. Later Events

Mr. Gibson saw another primary care provider, Dr. Beatty, in September 2017. Docket No. 33 at 4. Dr. Beatty's notes for that visit state the following about Mr. Gibson's HCV: "Patient has discordant fibroscan and biopsy results. It is unclear how to reconcile these perhaps sampling issue of biopsy. However, given the documented stage II to the fibrosis 5 years ago without intervening treatment it is unlikely that is [sic] had any regression of fibrosis. . . . I am going to refer him to hepatitis C treatment team to resolve the issue as he does meet tuba criteria based on biopsy results, it is difficult to argue for reliance on the scan rather than the histology." Docket No. 33 at 27.

Mr. Gibson later received the Harvoni treatment. He completed the course of treatment on June 11, 2018. Recent blood tests indicate that "Gibson has been cured and is no longer infected with the hepatitis virus." Docket No. 36-1 at 3.

## III.    VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred at a prison in Marin County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is

material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

Where, as is the situation with Defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine dispute of fact on each issue material to his affirmative defense. *Id*. at 1537; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine dispute of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Gibson' complaint is made under penalty of perjury, so the facts therein are considered in the adjudication of the summary judgment motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must

be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

# V.   DISCUSSION

A.   Eighth Amendment Claim

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim based on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

1.   Objective Prong

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

The evidence in the record suffices to allow a jury to conclude that Mr. Gibson's hepatitis C presented a serious medical need. The evidence shows that hepatitis C is an infectious disease affecting one of the human body's essential organs. On this record, a reasonable jury could conclude that Mr. Gibson's hepatitis C satisfied the Eighth Amendment's objective prong. *See Andrews v. Cervantes*, 493 F.3d 1047, 1055 & n.8 (9th Cir. 2007) (hepatitis C is a chronic disease that "quite obviously cause[s] serious health problems, and can result in death").

2.   Subjective Prong

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

Negligence does not amount to deliberate indifference and does not satisfy the subjective prong of an Eighth Amendment claim. S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (second alteration in original). *Compare id.* at 1055-56 (upholding summary judgment against plaintiff who challenged jail doctor's choice to discontinue a particular medication but did not present expert testimony showing that the discontinuation of the medication was medically unacceptable, and defense had submitted expert testimony that doctor's actions met the standard of care), *with Snow v. McDaniel*, 681 F.3d 978, 986-88 (9th Cir. 2012) (district court erred in granting summary judgment for defendants who argued that their refusal to approve double hip-replacement surgery for a prisoner

who could barely walk due to hip pain showed a mere difference of opinion where no medical reason was given for the refusal, an orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency, and some evidence suggested the refusal was due to the warden's dislike of death row prisoners such as the plaintiff), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

Viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr. Gibson, no reasonable trier of fact could find that Defendants' decision to defer treatment and continue to monitor Mr. Gibson, which resulted in the denial of Harvoni for him in mid-2016, was "'medically unacceptable under the circumstances'" and done "'in conscious disregard of an excessive risk to [Mr. Gibson's] health.'" *Toguchi*, 391 F.3d at 1058. First, the undisputed evidence shows that, at the relevant time, the most recent test results indicated that Mr. Gibson did not need treatment at that time. There was a conflicting test result that indicated treatment was necessary, but it was several years older than the newer results that indicated treatment was not necessary.[3] Second, the evidence is undisputed that Defendants' decision to defer treatment was in accordance with CCHCS guidelines that deferred treatment for inmates who had minimal liver disease or a low likelihood of significant liver disease. Third, the evidence is undisputed that the CCHCS approach to HCV treatment was consistent with nationally accepted standards of medical treatment for HCV patients. Fourth, the evidence is undisputed that most practitioners used a cautious and measured approach to Harvoni when it was introduced -- providing Harvoni first to patients with more advanced disease so that practitioners could become familiar with Harvoni's use, safety and efficacy profile. Unlike the situation in *Snow*, and like the situation in *Toguchi*, Defendants presented medical reasons for their choice to deny that the treatment which Mr. Gibson contends should have been provided. And, as in *Toguchi*, Mr. Gibson does not present expert evidence to show that Defendants' course of care was medically unacceptable.

---

[3] On the one hand, his 2012 liver biopsy result indicated that he had a grade 2/3 fibrosis, which suggested a need for treatment. On the other hand, his FIB4 scores in 2014-2016 were below 1.45 and indicated that it was unlikely that he had any significant fibrosis, and his 2016 FibroScan result indicated he had no significant fibrosis. The more recent results showed that he did not need treatment at that time. Defendants also presented undisputed expert opinion evidence that treatment was not medically necessary at the relevant time.

Drs. Vanjani, Rowe and Tootell also are not liable for damages for failing to provide Harvoni for Mr. Gibson in mid-2016, given the undisputed evidence that they were acting pursuant to a statewide policy that did not allow Harvoni under the circumstances; they did not have the power to override that policy. *Cf. Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) (en banc) ("A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate.").[4]

Here, the undisputed evidence shows that Defendants were subject to a statewide policy within the California prison system that directed that HCV treatment was to be deferred for inmates (such as Mr. Gibson) who had FIB4 scores of less than 1.45. The CCHCS Care Guide decision tree on "patient selection for treatment" stated that, if the FIB4 score was less than 1.45, provider was to "Defer treatment. Clinically reassess annually; include FIB4; FibroScan is not indicated." Docket No. 23-7 at 6. Another part of the HCV care policy in the California prison system was that an individual doctor could not prescribe HCV treatment without approval from the CCHCS HCV Oversight Committee, thus leaving each Defendant unable to order the Harvoni on his or her own. The CCHCS policy must be taken into consideration in evaluating whether individual Defendants acted with deliberate indifference. The policy in effect in California prisons did not authorize Harvoni treatment for Mr. Gibson during the relevant time, Drs. Vanjani, Rowe and Tootell cannot be held individually liable for not providing Harvoni to him during the relevant time since they were acting under a policy not shown to be invalid or unconstitutional. *See Peralta*, 744 F.3d at 1083; *see, e.g., Patkins v. Tran*, 2017 WL 2861914, *7 (N.D. Cal. 2017)

---

[4] In *Peralta*, the prisoner complained of delays of several months in getting his teeth cleaned and a failure to treat his dental pain related to cavities and bleeding gums; the prison dentist responded at trial with evidence that the prison's dental department was understaffed and there were not enough dentists to provide dental care on demand to prisoners. *Peralta*, 744 F.3d at 1081-82. The trial court instructed the jury that, whether a defendant has met his duties to a prisoner under the Eighth Amendment "'must be considered in the context of the personnel, financial, and other resources available to him or her or which he or she could reasonably obtain,'" and that a dentist "'is not responsible for services which he or she could not render or cause to be rendered because the necessary personnel, financial, and other resources were not available . . . or which he or she could not reasonably obtain.'" *Id.* at 1082 (ellipses in source). The Ninth Circuit upheld the giving of these instructions, explaining that an individual dentist is not liable for damages for failing to provide care that the dentist could not have provided; the resources available to the individual dentist are "highly relevant because they define the spectrum of choices that officials had at their disposal." *Id.* at 1083.

(applying *Peralta* to grant summary judgment on damages claim for prison dentist who failed to replace damaged bridge where statewide prison policy excluded bridges from dental services provided for inmates); *Allen v. Cheung*, 2014 WL 6685733, at *5-6 & n.5 (E.D. Cal. 2014) (applying *Peralta* to grant summary judgment for jail dentist where jail's policy was that root canals were not performed at all; jail dentist offered to extract tooth rather than perform root canal and did extract the tooth when equipment first became available). *Accord Vasquez v. Davis*, 882 F.3d 1270, 1278 (10th Cir. 2018) (upholding summary judgment for prison doctor on prisoner's claim that doctor was deliberately indifferent to prisoner's need for HCV treatment; doctor faced "at least two related problems in facilitating treatment[:] there is no indication that [the doctor] himself could authorize treatment; instead, HCV treatment had to be authorized by a CDOC infectious disease committee," and doctor's order for a biopsy to see if prisoner could qualify medically for HCV treatment experienced substantial delay because third-party medical payor delayed in approving it).

Mr. Gibson offers several arguments against the motion for summary judgment, but none are successful. He questions his FIB4 score, referring to it as "fictitious" and "illegitimate." Docket No. 34 at 5. These arguments, unsupported by any evidence, are insufficient to defeat summary judgment. Insofar as he means to suggest he never took a FIB4 test, he misses the mark because there is no evidence that the FIB4 was a test physically administered to a patient; to the contrary, the evidence is that the FIB4 score is a number reached by doing math with the patient's existing data. Likewise, he fails to present anything more than his say-so that a FIB4 test cannot exist without a FibroScan; his lay say-so as to the workings of a diagnostic tool is insufficient to create a triable issue of fact under the record in this case.

Mr. Gibson also argues that his 2016 FibroScan result might be suspect because he was obese and obesity can interfere with FibroScan results, according to a medical journal article he read. Docket No. 34 at 5. Citation to an article he read is not sufficient to defeat summary judgment because the article is inadmissible hearsay.[5] Even if he could overcome the hearsay

---

[5] Defendants' hearsay objection to the article and Mr. Gibson's statements relaying the contents of the article is sustained. Docket No. 36 at 10. "[I]t is well established that medical textbooks,

problem, the article would not enable him to avoid summary judgment because Mr. Gibson merely speculates that the risk mentioned in that article materialized in his case, i.e., that his obesity *did* interfere with his FibroScan results. No medical provider (or the scan operator) noted any such problem with the scan done on Mr. Gibson. *Cf. Mitchell v. Washington*, 818 F.3d 436, 443-44 (9th Cir. 2016) (upholding summary judgment on civil detainee's Fourteenth Amendment claim that doctor improperly denied him treatment for HCV; Plaintiff is not permitted to rely on excerpts from medical texts regarding treatment "contain guidelines and recommendations, rather than specific standards of care," and no document established that the doctor's treatment decisions were unreasonable).

Mr. Gibson also argues that Defendants' experts, Dr. Feinberg and Dr. Bick, relied on inaccurate data. As with his arguments that the FIB4 score and FibroScan result are suspect, Mr. Gibson offers no competent evidence to show that the medical data was inaccurate.

Next, Mr. Gibson argues that Defendants failed to examine discrepancies between his 2012 biopsy results and the later results, unlike another doctor who sent him to the HCV treatment team in September 2017 to resolve the issue presented by his conflicting test results. But Dr. Vanjani

---

treatises and professional articles are not freely admissible in evidence to prove the substantive or testimonial facts stated therein, since they are subject to the hearsay rule." *Hickock v. G.D. Searle & Co.*, 496 F.2d 444, 446 (10th Cir. 1974). A statement from a medical textbook, treatise or professional article may be admissible if the statement is established to be from a reliable medical authority and is relied upon by an expert witness. *See* Fed. R. Evid. 803(18); *Tart v. McGann*, 697 F.2d 75, 78 (2d Cir. 1982). Even assuming arguendo that the article could be shown to be a reliable medical authority, the hearsay exception in Rule 803(18) does not apply because Mr. Gibson has not shown that he has any medical expertise and has not presented any expert witness who relied upon any of the articles. Mr. Gibson urges that he has some common knowledge as an educated patient with HCV and a certified peer health educator. Docket No. 39 at 3. But this does not show him to be a medical expert, so as to make the article admissible (or to put him on the same footing as Defendants' experts). Thus, in evaluating Defendants' motion for summary judgment, the Court will not consider the article. *See generally Combs v. Washington*, 660 F. App'x 515, 518 (9th Cir. 2016) ("district court did not abuse its discretion when it excluded as hearsay several Internet articles about [plaintiff's medical conditions" and denied plaintiff's motion to appoint independent medical and dietary experts); *Nguyen v. Biter*, 2015 WL 5232163, at *9 (E.D. Cal. 2015) (excluding, on hearsay grounds, pro se plaintiff's "written information on arsenic, apparently obtained from the internet and perhaps a book"); *Taylor v. Patel*, 2017 WL 3315319, *2 (E.D. Cal. 2017) (sustaining objection to pro se plaintiff's printout from internet site discussing the different purposes of an x-ray and an MRI).

did address the conflicting test results: in March 2016, Dr. Vanjani ordered a FibroScan (which Dr. Rowe approved) because of the conflict between the 2012 biopsy and the FIB4 scores. The FibroScan result then came back supporting the determination that there was no significant fibrosis, a result consistent with the FIB4 scores. Defendants' decisions were medically appropriate, according to an expert witness. Docket No. 23-1 at 6-7. Mr. Gibson's desire that further efforts be made to try to further resolve the discordant test results represents, at most, a difference of opinion as to the proper course of care for his HCV. Such a difference of opinion does not amount to deliberate indifference. *See Sanchez v. Vild*, 891 F.2d at 242. Dr. Vanjani's decision was not medically unacceptable.

Finally, Mr. Gibson apparently wants to import a promissory estoppel sort of theory into the Eighth Amendment claim, as he argues that Defendants "were deliberately indifferent . . . by breaching [an] agreement to render him medical treatment, in violation of the Eighth Amendment." Docket No. 33 at 2. In other words, he contends that, since he was told by other prison doctors in 2012-2013 that he was eligible for HCV treatment, Defendants had no right to deny him treatment in 2016 once Harvoni became available. Mr. Gibson has not identified, and the Court has not located, any case standing for the proposition that a breach of a promise establishes deliberate indifference for Eighth Amendment purposes. Indeed, such a theory could thrust burdens onto doctors that might well be inconsistent with their professional judgment; e.g., if any doctor at any time said a patient qualified for a treatment, all doctors for all time would be obliged to provide that treatment, regardless of current medical appropriateness or necessity. Mr. Gibson's argument also fails because the doctors in 2016 did not confront the same medical data that was before the doctors who determined he qualified for treatment in 2012. Specifically, the newer FIB4 scores and the 2016 FibroScan results showed that Mr. Gibson's disease was not at a stage where he qualified for or needed treatment. Defendants did not deny treatment forever, but only determined that treatment was to be deferred because Mr. Gibson's test results did not suggest a medical need for treatment at that time. Mr. Gibson has not provided any authority for the proposition that doctors must provide treatment that was once recommended when new data suggests treatment is now not appropriate. Mr. Gibson's condition continued to be monitored,

16

and eventually he was put on Harvoni in 2018.

Ultimately, Mr. Gibson shows nothing more than a difference of opinion as to whether he should have been treated with Harvoni in 2016. That difference of opinion does not amount to deliberate indifference. *See Sanchez v. Vild*, 891 F.2d at 242. Courts have rejected similar claims. *See, e.g., King v. Calderwood*, 2016 WL 4771065, at *5-6 (D. Nev. 2016) (granting summary judgment for defendants on prisoner's Eighth Amendment claim that he should have been provided Harvoni; medical director rejected request for treatment using standard formula to determine amount of liver damage and, based on that score, determined that prisoner was not exhibiting symptoms of decreased liver function notwithstanding prisoner's evidence that he had been experiencing painful symptoms and notwithstanding recommendation by one doctor that he receive HCV treatment); *Fitch v. Blades*, 2016 WL 8118192, at *7 (D. Idaho 2016) (recommending granting motion for summary judgment in defendant's favor on claim that defendants refused HCV treatment; "the medical records indicate Dr. Young made a deliberate, careful judgment about the course of Plaintiff's treatment based upon the severity of Plaintiff's disease, mental health issues, and likelihood of compliance"), *recommendation adopted*, 2017 WL 411203 (D. Idaho 2017).

When the evidence is viewed in the light most favorable to Mr. Gibson, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against Drs. Vanjani, Rowe or Tootell on his Eighth Amendment claim regarding the Harvoni denial in mid-2016. Drs. Vanjani, Rowe and Tootell therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

Defendants also argue that they are entitled to judgment as a matter of law on the claim against them in their official capacities. The Court agrees. The Eleventh Amendment to the U.S. Constitution bars from the federal courts suits against a state by its own citizens, citizens of another state, or citizens or subjects of any foreign state, absent consent to the filing of such suit. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 237-38 (1985). Eleventh Amendment immunity also extends to state officials sued in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985). After filing this action, Mr. Gibson received the requested Harvoni treatment,

so only claims for damages remain and there is no possibility of injunctive relief.[6]   Defendants are state officials and therefore are entitled to Eleventh Amendment immunity with regard to the claims for damages against them in their official capacity.

B.   Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.  One prong requires the court to ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.*  The other prong requires the court to "ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The evidence in the record does not establish that Defendants violated Mr. Gibson's constitutional rights in their responses to his request for Harvoni in mid-2016.  Defendants prevail

---

[6] Mr. Gibson argues in his sur-reply that the fact that he has been given the requested Harvoni does not "detract or negate what transpired before," i.e., the pain and suffering he endured while waiting for the Harvoni.  Docket No. 39 at 2.  He misunderstands the relevance of the treatment.  Defendants did not argue, nor does the Court find, that later treatment would eliminate his entitlement to damages, if an Eighth Amendment violation was shown.  Rather, the information that he has been treated and cured is of significance in that it means that the Court could not now issue an injunction requiring that he now be treated.  Of course, Mr. Gibson did not actually request such an injunction in his complaint, *see* Docket No. 1 at 7-8, but there is no reason to do so now, given that he already has received the treatment.

on the first prong of the *Saucier* analysis. Even if a constitutional violation had been shown, however, Defendants would prevail on the second prong of the *Saucier* analysis. A reasonable medical staff member would not have understood that it would violate an inmate's constitutional rights to defer HCV treatment for an inmate whose most recent test results suggested no significant liver fibrosis and when the statewide policy called for deferring HCV treatment under those circumstances, particularly when there is no showing that the policy was inconsistent with general medical practices. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. Docket No. 23. All Defendants are entitled to judgment in their favor. The clerk shall close the file.

Defendant's request for an extension of the deadline to file a reply is **GRANTED**. Docket No. 35. The reply filed on July 18, 2018, is deemed to have been timely filed.

Plaintiff's motion to file a sur-reply is **GRANTED**. Docket No. 37. The Court has considered the information in the sur-reply in ruling on the motion for summary judgment.

**IT IS SO ORDERED**.

Dated: August 24, 2018

_____
EDWARD M. CHEN
United States District Judge